RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0179P (6th Cir.)
File Name: 03a0179p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

INTERNATIONAL UNION,
UNITED MINE WORKERS OF
AMERICA,
    *Plaintiff-Appellant,*

    *v.*

APOGEE COAL CO., ARCH
COAL INC., and ARK LAND
CO.,
    *Defendants-Appellees.*

No. 01-6584

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 99-00574—Jennifer B. Coffman, District Judge.

Argued: April 30, 2003

Decided and Filed: June 5, 2003

Before: CLAY and GIBBONS, Circuit Judges; DUGGAN,
District Judge.[*]

---

[*] The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

---

---

## COUNSEL

**ARGUED:** Deborah Stern, ASSISTANT GENERAL COUNSEL, UNITED MINE WORKERS OF AMERICA, Fairfax, Virginia, for Appellant. Thomas P. Gies, CROWELL & MORING, Washington, D.C., Michael W. Hawkins, DINSMORE & SHOHL, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Deborah Stern, ASSISTANT GENERAL COUNSEL, UNITED MINE WORKERS OF AMERICA, Fairfax, Virginia, James R. Hampton, Hazard, Kentucky, John R. Mooney, MOONEY, GREEN, BAKER & SAINDON, Washington, D.C., for Appellant. Thomas P. Gies, CROWELL & MORING, Washington, D.C., Barbara B. Edelman, Lizbeth L. Baker, DINSMORE & SHOHL, Lexington, Kentucky, for Appellees.

---

## OPINION

---

JULIA SMITH GIBBONS, Circuit Judge. Plaintiff-appellant United Mine Workers of America (UMWA) filed suit in federal district court pursuant to § 301 of the National Labor Relations Act, 29 U.S.C. § 185, alleging that defendants-appellees Apogee Coal Co. (Apogee) (an employer signatory to a collective bargaining agreement with the UMWA), Arch Coal Inc. (Arch) (the parent company of Apogee), and Ark Land Co. (Ark Land) (a wholly owned subsidiary of Arch), had violated the successorship clause contained in Article I of the 1998 National Bituminous Coal Wage Agreement. The district court granted summary judgment in favor of defendants-appellees, and the UMWA appealed. For the following reasons, we affirm the district court's grant of summary judgment in favor of defendants-appellees.

## I.

The United States Steel Corporation (USSC) began developing coal mines on property located in Lynch, Kentucky (the Lynch mining complex) in 1917. In 1937, the coal miners at the Lynch mining complex organized and joined the UMWA. Local Union 7245 has represented the coal miners at the Lynch mining complex since 1937.

The Bituminous Coal Operators Association (BCOA) is a multi-employer group established to engage in collective bargaining. The BCOA has bargained with the UMWA for a series of collective bargaining agreements known as the National Bituminous Coal Wage Agreements (NBCWA). All versions of the NBCWA since 1974 have included an identical successorship provision. The "Enabling Clause" of Article I of the NBCWA provides:

> This Agreement shall be binding upon all signatories hereto, including those Employers which are members of signatory associations, and their successors and assigns. In consideration of the Union's execution of this Agreement, each Employer promises that *its operations* covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the Employer's obligations under this Agreement.

(emphasis added). USSC was a signatory to the 1974 version of the NBCWA. USSC subsequently established U.S. Steel Mining Co. (USM) to operate the Lynch mining complex and "step into USSC's shoes as the signatory company to the 1981 NBCWA."

In 1984, Arch and the UMWA discussed the potential acquisition of certain coal reserves from USSC and coal mining operations from USM. In a letter dated August 15, 1984, the UMWA indicated that it understood that Arch would acquire the active coal mining operations of USM

through a new wholly-owned subsidiary, Apogee. The UMWA noted that Apogee would become a successor to USM and assume that company's obligations under the 1981 NBCWA. The UMWA also observed that Arch would not become a signatory to the NBCWA.

With this understanding, on September 28, 1984, USSC and USM entered into an agreement with Arch, Apogee, and Ark Land (a land management company and a wholly-owned subsidiary of Arch) relating to the Lynch mining complex. Pursuant to this agreement, USSC sold its interest in the Lynch mining complex to Arch and the coal reserves to Ark Land, while USM sold its coal mining operations to Apogee. At the time of the transaction, USM was operating the No. 32 Mine, the No. 33 Mine, the No. 37 Mine, the Corbin coal preparation plant, and a facility known as the Lynch No. 1 loadout. Apogee, a member of the BCOA, assumed successorship obligations under the 1984 NBCWA. Arch and Ark Land have never signed any version of the NBCWA.

Mine No. 32 ceased producing coal in June 1988. Mine No. 33 and the Lynch No. 1 loadout facility were closed in April 1990. The land around Mine No. 32 and Mine No. 33 has since been reclaimed. Apogee also closed the Corbin preparation plant in June 1994, and the plant and surrounding land were sold to a third party.

Only two mines operated by Apogee at the Lynch mining complex produced any coal after September 1995: the Perkins Branch Surface Mine and Mine No. 37. Mining at the Perkins Branch Surface Mine ceased in December 1997 because the coal reserves had been fully mined. The land around the Perkins Branch Surface Mine has since been reclaimed.

Beginning in September 1997, Mine No. 37 lost several million dollars. Apogee management was unable to develop a profitable business plan and eventually closed Mine No. 37 in January 1998. In a letter dated January 30, 1998, Apogee informed UMWA-represented employees that production had

ceased and that the facility closure was permanent. All of Apogee's UMWA-represented workers at the Lynch mining complex were laid off, with the exception of certain senior employees at the Cave Branch coal preparation plant, who were retained to process and load previously mined coal, and certain salaried mine foreman, who were retained to retrieve and remove all salvageable equipment from Mine No. 37. All equipment was moved out of Mine No. 37, and the power and ventilation were both cut off. By June 1998, all deep mine portals associated with any of the mines held, operated, or developed by Apogee in and around the Lynch mining complex had been sealed. In a hearing before the district court on September 7, 2001, the UMWA stated its belief that the mines had not been closed in "bad faith" and that they had in fact "been shut down for legitimate economic reasons." (J.A. 861.)

On September 28, 1998, Apogee and Resource Development LLC (RDL) entered into an asset purchase agreement under which Apogee agreed to sell its mining permits, equipment, and rights to mine coal under its lease with Ark Land to RDL in return for $15 million. Pursuant to this agreement, Apogee delivered to RDL at closing a document terminating its lease with Ark Land. In September 1998, after receiving bids from several interested parties, Ark Land entered into a lease of the coal reserves with RDL. Neither Apogee nor Ark Land required RDL to assume any obligations under Article I of the NBCWA.

On September 29, 1998, Apogee and Processing Systems LLC (PSL) entered into an asset purchase agreement under which Apogee agreed to sell the Cave Branch coal preparation plant to PSL in return for $100,000. Since the Cave Branch preparation plant still had employees, Apogee concluded that the disposition of the plant would be subject to the successorship provisions of the NBCWA. As a result, PSL specifically assumed Apogee's obligations with respect to Article I of the 1998 NBCWA.

In August or September of 1999, RDL began reopening portals at the Lynch mining complex that previously had been sealed. RDL began extracting coal from the Lynch mining complex in October 1999. Among the mines that were reactivated were the Owl Mine, the Stillhouse Mine, and the Highsplint No. 2 Mine. The Owl Mine previously had been closed by USM around 1979 or 1980, was unsealed by Apogee in 1987, remained open for about eight months, and then was closed and sealed again. The Stillhouse Mine was opened by Apogee in 1991 and closed and sealed in August 1992. Apogee opened the Highsplint No. 2 Mine in 1987, closed and sealed it in 1990, removed the seals shortly thereafter, and operated the mine until it was again closed in April 1991.

On November 9, 2000, the UMWA filed its First Amended Complaint in the United States District Court for the Eastern District of Kentucky. The UMWA alleged that Apogee had violated the successorship clause contained in Article I of the 1998 NBCWA by selling mining permits, equipment, and its rights to mine coal under its lease with Ark Land to RDL and by terminating its lease with Ark Land without securing a commitment from either RDL or Ark Land to abide by the 1998 NCBWA. The UMWA further alleged that Arch, Apogee, and Ark Land "are a single employer and/or alter egos, and thus are all bound by the 1998 NBCWA with respect to the Lynch coal mining complex." On November 7, 2001, the United States District Court for the Eastern District of Kentucky granted defendants-appellees' motions for summary judgment.

## II.

A district court's grant or denial of a motion for summary judgment is reviewed *de novo*. *See Braithwaite v. Timken Co.*, 258 F.3d 488, 492-93 (6th Cir. 2001). When reviewing the record, all inferences shall be drawn in the light most favorable to the non-moving party. *Id.* (citing *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 245-46 (6th Cir. 1997)).

However, an opponent of a motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The party opposing the motion must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If after reviewing the record as a whole a rational factfinder could not find for the nonmoving party, summary judgment is appropriate." *Braithwaite*, 258 F.3d at 493 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998)).

In granting summary judgment in favor of defendants-appellees, the district court concluded that "Apogee's actions in transferring its mining permits, equipment, and its lease to RDL did not constitute the transfer of 'operations.'" The UMWA now argues that the meaning of the term "operations" in Article I of the 1998 NBCWA "cannot be discerned on its face."

"A collective bargaining agreement is not governed by the same principles of interpretation applicable to private contracts." *Operating Eng'rs Pension Trusts v. B & E Backhoe, Inc.*, 911 F.2d 1347, 1352 (9th Cir. 1990) (citing *Transportation-Communication Employees Union v. Union Pac. R.R. Co.*, 385 U.S. 157, 160-61 (1966) (a collective bargaining agreement is not a private contract between two private parties, but is rather a generalized code to govern a myriad of cases and parties that calls into being a new common law of a particular industry or plant, and cannot be interpreted without considering the scope of other related collective bargaining agreements as well as the practice, usage and custom pertaining to all such agreements)). A court may consider extrinsic evidence of the parties' intent at the time of execution if the collective bargaining agreement is ambiguous. *Id.* (citing *Kemmis v. McGoldrick*, 767 F.2d 594, 597 (9th Cir. 1985)). Whether the language of a written

agreement is ambiguous is a question of law that "'may be resolved summarily.'" *Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993) (quoting *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1360 (11th Cir. 1988)). Summary judgment is appropriate only when no question exists as to intent. *Id.*

The plain meaning of the term "operations" in Article I of the NBCWA is unequivocal. According to Black's Law Dictionary, operation denotes "the process of operating or mode of action; . . . action; activity." BLACK'S LAW DICTIONARY 1092 (6th ed. 1990). Although this court has not previously considered this issue, this understanding of the term has been confirmed by other courts. "Federal courts have consistently held that the successorship clause applies only to the sale of an active coal mine." *UMWA v. Sewell Coal Co.*, C.A. No. 2:92-0432, at 5 (S.D.W.Va. July 9, 1993) (granting summary judgment to defendant employer as a matter of law).

For example, in *UMWA Dist. 6 v. North American Coal Corp.*, C.A. No. C-2-79-242, at 6 (S.D. Ohio Mar. 21, 1980), the court held that the sale of a coal preparation plant that had been closed for fourteen months did not constitute a transfer of "operations" as contemplated by Article I of the NBCWA and granted summary judgment in favor of the defendant employer. The court noted that the coal preparation plant "lay still for three months until March 1, 1978 at which time North American announced its intention to close the mine for good. There is no suggestion that the closing was made in bad faith." *Id.* Similarly, in *UMWA, International Union v. U.S. Steel Mining Co.*, 636 F. Supp. 151, 153-54 (D. Utah 1986), *aff'd*, 895 F.2d 698 (10th Cir. 1990), the court held that

> as a matter of law, a mining "operation," for purposes of Article I of the 1984 NBCWA, refers to a mine site or facility where active coal mining operations are being conducted. That is, an "operation" connotes a mine that is actively producing coal and operating as a coal mine.

Thus, a mine that has ceased to function as an active coal mine is not an "operation," assuming the mine was closed in good faith.

The court noted that the mines at issue were "no longer economically viable" and added that "[t]here is no suggestion in the record that U.S. Mining closed the mine in bad faith or that the closure was motivated to avoid successorship obligations." *Id.* at 154. The court thus concluded that "the successorship clause, Article I of the 1984 NBCWA, did not require U.S. Mining to secure [the purchaser's] unconditional agreement to assume U.S. Mining's obligations under the 1984 NBCWA" and granted summary judgment in favor of the defendant employer. *Id.*; *see also In re Chateaugay Corp.*, 891 F.2d 1034, 1038-39 (2d. Cir. 1989) (noting that the "intended meaning of the word 'operations' . . . is unclear" and "ambiguous" but nevertheless finding as a matter of law that the term "does not apply to the sale of a mine that has been permanently closed in good faith by a seller that retains no financial interest in any potential future mining activity at the site, and there is no evidence that the same operations, as when the [NBCWA] was executed, could reasonably be contemplated or conducted"); *UMWA, Dist. 31 v. Thames Dev. Ltd.*, 821 F. Supp. 426, 428 (S.D. W.Va. 1993) (holding that the "term 'operation' connotes a mine that is actively producing coal and operating as a coal mine" and granting summary judgment due to the absence of any "evidence or allegation this termination of operations was temporary, taken in bad faith, or to avoid obligations under the successorship clause") (quotation omitted); *BethEnergy Mines, Inc. v. Dist. 30, UMWA, Local Union No. 5741*, 714 F. Supp. 260, 264 (E.D. Ky. 1988) (distinguishing between "a coal mine operation actively mining, producing, and shipping coal to market and coal lands upon which there was no coal mining activity" and holding that "[t]he plain meaning of 'operations' does not included 'coal lands'").

In light of the language of the agreement and these authorities, the district court correctly concluded that "[t]he

term operations in Article I connotes actively producing mines and does not include mines closed in good faith for economic reasons." Moreover, since the undisputed facts of this case indicate that no "operations" were transferred, summary judgment was appropriate. The record reflects that all of the deep mine portals associated with the mines held, operated, or developed by Apogee in and around the Lynch mining complex had been sealed for at least three months prior to the transaction with RDL. UMWA-represented employees were informed in writing that the closure was permanent. All UMWA-represented workers at the Lynch mining complex were laid off, with the exception of employees retained to assist with the removal of equipment and previously mined coal from the site. In addition, there is no factual dispute with regard to Apogee's motivation for closing its mines. The UMWA has conceded that all of Apogee's mines were closed in good faith, for legitimate economic reasons.

None of the cases upon which the UMWA relies support a more expansive interpretation of the term "operations." Rather, on those occasions where courts have denied summary judgment for the employer on the ground that "operations" had been transferred pursuant to Article I of the NBCWA, the UMWA has raised disputed issues of fact with regard to whether the mines were actually closed or whether the employer's motivation for closing the mines was improper. For example, although the district court in *CF & I Fabricators of Utah, Inc. v. Conners*, 163 B.R. 858, 871 (D. Utah 1994), found that mines which had ceased actively producing coals for six months prior to being sold constituted "operations" under Article I of the 1981 NBCWA, the court specifically noted that the mines were not closed but instead were "on idle standby status." The court also observed that "[t]he employees were on temporary lay off. The Mines [sic] had not been abandoned or sealed. There is no evidence that there had been any announcement that the mines would not be reopened." None of those circumstances are present here.

The UMWA's reference to *International Union, UMWA v. Eastover Mining Co.*, 603 F. Supp. 1038 (W.D. Va. 1985) is also inapposite. Although the court in that case held that the sale of a closed mine was a transfer of "operations" subject to the successorship provisions of the 1981 NBCWA, later courts have explained that *Eastover* is more properly understood as a "bad faith closure." *U.S. Steel*, 636 F. Supp. at 155. "The shutdown [in *Eastover*] was, from the start, forthrightly conceded by the seller and buyer to have been motivated as a device to avoid the successorship obligation by idling the mine before the sale and letting it remain idle after the sale until the end of the UMWA contract." *Id.*; *see also In re Chateaugay Corp.,* 891 F.2d at 1038 (stating that "[i]n *Eastover*, the court explicitly found that the mine was closed in order to circumvent the collective bargaining agreement"). As a result, "*Eastover* must be read in light of the single overriding factor: The manipulated closing of the mine prior to the sale constituted an obvious artifice to avoid the successorship obligation." *Id.*; *see also UMWA, Int'l Union v. U.S. Steel Mining, Inc.*, 895 F.2d 698, 701 (10th Cir. 1990) (noting that in *Eastover* "the seller's closure of the mine was clearly motivated by a desire to avoid the successorship obligation"). The instant case involves very different facts. The UMWA specifically told the district court that the closure of the mines was not undertaken in "bad faith."

The remaining cases upon which the UMWA relies also involve disputed factual issues not present in this case. In *UMWA v. Kitt Energy Corp.*, C.A. No. 87-822, at 3 (W.D. Pa. Mar. 22, 1991) (unpublished), the court denied the employer's summary judgment motion due to the fact that the UMWA had presented "some evidence indicating that negotiations for the sale began prior to the time production ceased," thereby implying bad faith on the part of the employer. In a hearing before the district court in the instant case, the UMWA admitted that the employer in *Kitt Energy* had closed the Kitt mine with "fraudulent intent." As previously noted, the UMWA has made no similar allegations of bad faith in this case. The court in *Kitt Energy* also noted that "most of the

equipment remained on site and the mine was not sealed or abandoned." *Id.* In this case, by contrast, all of the deep mine portals at the Lynch mining complex had been sealed three months prior to the transaction at issue, and the equipment was removed from the site. Likewise, in *UMWA, Int'l Union v. Cyprus Amax Coal Co.,* C.A. No. 97-Z-374, at 1 (D. Colo. Jan. 28, 1998), the court denied the employer's motion for summary judgment because "genuine issues of material fact remain in this case with regard to whether the Castle Gate Mine and the Castle Gate Plant were shut down for a bona fide business reason." Here, however, the record reflects that the facilities at issue had "been shut down for legitimate economic reasons."

The UMWA argues that the district court erred by selectively considering "only prior judicial determinations concerning the application of Article I to the sale of closed mining facilities" in determining whether any "operations" were transferred by defendants-appellees, while ignoring "evidence of bargaining history, the historical practices of the parties under Article I at the very mining facility in question, as well as industry practice." (Appellant's Brief at 4, 23.) The UMWA asserts that by "accord[ing] greater weight" to judicial precedent, the district court improperly "usurp[ed] the role of trier of fact." (*Id.* at 23.) This argument lacks merit. As previously noted, "[i]f a contract is clear and unambiguous . . . there is no issue of fact to be determined." *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 684 (6th Cir. 2000) (quoting *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio*, 474 N.E. 2d 271, 272-73 (Ohio 1984)). In this case, since the meaning of the term "operations" in the successorship clause was unequivocal, the district court did not need to consider any extrinsic evidence concerning the intent of the parties.

Moreover, the fact that the language of the successorship clause in Article I of the NBCWA has not been altered since 1974 serves to confirm the lack of ambiguity as to the meaning of the term "operations." "It should be noted that

[a]ll collective bargaining agreements between BCOA and the UMWA are not conceived in a vacuum; each side has lawyers scrutinizing every word in light of old interpretations." *BethEnergy Mines*, 714 F. Supp. at 263 (E.D. Ky. 1988) (quotation omitted). As previously discussed, courts have analyzed the meaning of the term "operations" in the successorship clause on numerous occasions and have interpreted the term consistently. "If these interpretations did not accord with the parties' understanding of their contract, they had ample opportunity to make their own understanding explicit. Failure to do so strongly suggests the parties incorporated the courts' interpretation of the agreements." *Carbon Fuel Co. v. UMWA*, 444 U.S. 212, 222 (1979). Here, the fact that the language of the successorship clause has remained unchanged since 1974 is compelling evidence that prior courts' determinations that the term "operations" refers to active mines and not to mines closed in good faith for economic reasons was consistent with the intent of the parties. Limited consideration of extrinsic evidence in this manner does not foreclose summary judgment. "Extrinsic evidence can become a consideration *before* an ambiguity has been identified from the face of the contract as a matter of law, in the limited sense that such evidence can assist the court in determining whether, as a matter of law, two plausible interpretations exist in the manner necessary to give rise to the *existence* of an ambiguity." *Lincoln Elec. Co.*, 210 F.3d at 684 n. 12 (6th Cir. 2000) (citing *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1548-49 (11th Cir. 1996)). In this case, only one plausible interpretation of the term "operations" in Article I of the 1998 NBCWA exists– namely, that it "connotes actively producing mines and does not include mines closed in good faith for economic reasons."

### III.

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of defendants-appellees.