**LOCAL 377, CHAUFFEURS, TEAMSTERS, WAREHOUSEMEN, AND HELPERS OF AMERICA, Plaintiff,**

v.

**HUMILITY OF MARY HEALTH PARTNERS, Defendant.**

No. 4:01 CV 02636.

United States District Court, N.D. Ohio.

Aug. 11, 2003.

---

Robert S. Moore, Canfield, OH, for Plaintiff.

Devin J. Oddo, Janik & Dorman, Cleveland, OH, John N. Childs, Brennan, Manna & Diamond, Akron, OH, for Defendant.

## MEMORANDUM OPINION AND ORDER

ECONOMUS, District Judge.

This matter is before the Court upon the parties' cross-motions for summary judgment. (Dkt. # 23; Dkt. # 24.)

## I. FACTUAL HISTORY

The following facts are undisputed unless otherwise noted. The Defendant, Humility of Mary Health Partners ("HM"), operates health care facilities located in Youngstown, Ohio. (Dkt. # 1, Compl. ¶ 3; Dkt. # 8, Answer ¶ 3.) The Plaintiff, Local No. 377, Chauffeurs, Teamsters, Warehousemen and Helpers of America ("the Union"), is the collective bargaining representative for certain hourly employees of HM. (Compl. ¶ 2; Answer ¶ 2.)

*CBA I*

From May 10, 1998 through May 9, 2001, HM and the Union were parties to a collective bargaining agreement("CBA I") that established the terms and conditions of employment at HM. (Dkt. # 29 (hereinafter "CBA I").) Of particular pertinence, Article VII, section 1 of CBA I precluded HM from disciplining or discharging any Union employee without just cause. *See* (CBA I, Art. VII § 1).

Additionally, Article IX of CBA I established a three-step grievance procedure for resolving "any disagreement between HM and the Union concerning the interpretation and/or application of, or compliance with, the provisions of the CBA." (CBA I, Art. IX § 1.) The first step required an aggrieved employee to discuss the matter with his/her immediate supervisor. *See* (CBA I, Art. IX § 2). Should the employee and the supervisor fail to resolve the matter, Step I required that the parties indicate the result in writing. *See* (CBA I, Art. IX § 2). In the event of such a failure, Step II afforded the employee with the opportunities to detail in writing the circumstances giving rise to the grievance

and to meet with the next highest supervisor.[1] *See* (CBA I, Art. IX § 2). Should the parties fail to resolve the matter at the Step II stage, Step III afforded the employee and, or Union with the opportunity to appeal in writing to HM's Vice President of Human Resources. *See* (CBA I, Art. IX § 2). Step III required the Vice President of Human Resources to meet with the employee and, or the Union and promptly issue a decision. *See* (CBA I, Art. IX § 2).

Following the issuance of a Step III decision, the aggrieved party could request an arbitral hearing. *See* (CBA I, Art. IX § 3a). Upon the issuance of a request for arbitration, the parties proceeded to jointly select one arbitrator from a standing nine-member panel of arbitrators.[2] *See* (CBA I, Art. IX §§ 3(B) & 4). Article IX required the arbitrator to hold a hearing and to issue a written decision presenting findings of fact, as well as a determination regarding the existence/nonexistence of a breach of the CBA. *See* (CBA I, Art. IX § 4).

*The Strike and Unrest on the Picket Line*

In early May 2001, representatives from HM and the Union met on several occasions for the purposes of modifying CBA I or entering into a new collective bargaining agreement. *See* (Deposition of Christopher P. Colello ("Colello Dep.") at 10–11). Negotiations collapsed on May 12,

2001 and members of the Union immediately commenced a strike at HM's facilities. *See* (Dkt. # 23, Mem. In Support at 2; Dkt. # 24, Mem. In Support at 2; Colello Dep. at 10–11.)

On May 15, 2001,[3] HM security officers arrested (the "arrests") two HM employees and members of the Union, Richard Hollis ("Hollis") and John Acevedo ("Acevedo"), as well as the Union's Business Representative, Raymond DePasquale ("DePasquale"), for allegedly engaging in violent conduct while picketing at an HM facility.[4] *See* (Dkt. # 23, Mem. In Support at 2–3; Dkt. # 24, Mem. In Support at 2; Deposition of John R. Doll ("Doll Dep.") at 6–7, 28–29, 38; Deposition of G. Roger King ("King Dep.") at 14, 23; Deposition of Molly Seals ("Seals Dep.") at 13–17; Deposition of Ken Norris ("Norris Dep.") at 12; Dkt. # 27, Joint App. of Stipulated Exs. ("J.A.") ## 7 & 8).

*The May 21–22, 2001 Negotiations*

Members of the parties' negotiating teams resumed intensive labor negotiations on May 21 and May 22, 2001. *See* (Dkt. # 23, Mem. In Support at 2; Dkt. # 24, Mem. In Support at 2–3; Doll Dep. at 7–10; King Dep. at 6, 10–11; Seals Dep. at 11; Colello Dep. at 13; J.A. ## 2,3,4). During an intermission on the evening of May 21, 2001, members of the Union's negotiating team became aware of the arrests.[5] *See* (Dkt. # 23, Mem. In Support at 2–3; Doll Dep. at 27; Colello Dep. at

---

1. In addition, all grievances alleged by the Union were initiated at the Step II stage. (CBA, Art. IX § 2.)

2. CBA I required the selection of the arbitrator through the "alphabetical rotation method." (CBA, Art. IX § 3(B)).

3. HM's briefs erroneously indicate May 21, 2001 as the date of the unrest on the picket line. *See* (Dkt. # 24, Mem. In Support at 2, 7). As discussed *infra*, May 21, 2001 is the date the negotiating teams became aware of the arrests.

4. An arrest warrant was issued for DePasquale. *See* (Colello Dep. at 18; Norris Dep. at 12). It is unclear whether an arrest warrant was issued for Acevedo and Hollis or whether HM security officers took immediate custody of the pair.

5. The parties repeatedly refer to events and conversations that occurred during the negotiation sessions and they make significant references to notes taken by members of the negotiation teams during the May 21st and May 22nd session. *See* (J.A. ## 2,3,4). A review of the record indicates that the parties

18). The parties reconvened on or around 10:45 p.m. and HM's chief negotiator, G. Roger King ("King"), proposed, *inter alia,* that the Union guarantee that the Union would not assess additional dues and, or initiation fees against any employee who continued to work during the strike (i.e. an employee that. "crossed the picket-line") (the "Union Security proposal"). *See* (Doll Dep. at 28–29; King Dep. at 12,14; Colello Dep. at 17). At approximately 1:30 a.m. on the May 22nd, the Union's chief negotiator, John R. Doll ("Doll"), proposed that HM afford complete amnesty to the arrested individuals (i.e. HM dropping the criminal charges) (the "Amnesty proposal") in return for the Union's agreement to the Union Security proposal. *See* (Dkt. # 23, Mem. In Support at 3; Dkt. # 24, Mem. In Support at 3; Doll Dep. at 37; King Dep. at 15, 17, 18; Seals Dep. at 15; Colello Dep. at 7). The parties adjourned negotiations at approximately 3:00 a.m. without any agreement. *See* (Doll Dep. at 37–38; Seals Dep. at 12).

The parties reconvened at 3:00 p.m. and HM subsequently informed the Union that it would not agree to the Amnesty proposal. *See* (Dkt. # 23, Mem. In Support at 3; Dkt. # 24, Mem. In Support at 3; Doll Dep. at 41–48; King Dep. at 21,24; Seals Dep. at 16–17; Colello Dep. at 21). King expressly stated that HM's position was to "let the system work" to resolve the arrests. *See* (Dkt. # 23, Mem. In Support at 3; Dkt. # 24, Mem. In Support at 3; Doll Dep. at 44; King Dep. at 24; Seals Dep. at 17; Colello Dep. at 22). Consequently, the Union did not agree to the Union Security proposal. *See* (Doll Dep. at 47).

By the night of May 22nd, the parties entered into a tentative collective bargaining agreement. *See* (Dkt. # 23, Mem. In Support at 5; Dkt. # 24, Mem. In Support at 4). The Union ratified CBA II on May 23, 2001 and the employees returned to their positions at HM. *See* (Dkt. # 23, Mem. In Support at 5; Dkt. # 24, Mem. In Support at 4).

*HM's termination of Acevedo and Hollis*

On May 29, 2001, HM held a meeting with Acevedo, Hollis and representatives from the Union to discuss the arrests. *See* (Dkt. # 23, Mem. In Support at 5; Dkt. # 24, Mem. In Support at 4; Norris Dep. at 26; J.A. # 5). HM thereafter suspended Acevedo and Hollis pending a disciplinary investigation. *See* (J.A. # 6). By letters dated June 14, 2001, HM terminated Acevedo and Hollis—effective May 29, 2001—"for misconduct [ ] engaged in on [Tuesday, May 15, 2001] at [the] health center." *See* (J.A. # 6); *see also* (Dkt. # 23, Mem. In Support at 6; Dkt. # 24, Mem. In Support at 4).

*The Union's attempt to initiate the grievance procedures*

On June 19, 2001, Acevedo and Hollis filed grievances (# 00133 and # 00134 respectively, hereinafter the "grievances") challenging their "termination without just cause." [6] *See* (J.A. # 4); *see also* (Compl. ¶¶ 9,10; Answer ¶¶ 9, 10; Dkt. # 23, Mem. In Support at 6; Dkt. # 24, Mem. In Support at 4). Although CBA II established a three-step grievance procedure mirroring that provided in CBA I,[7] HM returned the grievances to the Union, asserting:

examined theses notes in detail during the depositions; therefore, the Court hereinafter shall cite to the deposition transcripts, rather than these frequently illegible notes. Moreover, for the reasons discussed *infra*, the Court refers to the negotiation sessions as a manner of background information and no conclusions of law rest on this factual predicate.

6. As in CBA I, CBA II provided that HM "shall not discipline or discharge any employee without just cause." (J.A. # 1 (hereinafter "CBA II"), Art. VII § 1).

7. Indeed, the lone apparent distinction between the grievance procedure in CBA I and CBA II is that, in the latter, the parties jointly select an arbitrator, rather than employ the

The attached grievances (# 00133 and 00134) are being returned to you because the incidents causing the terminations occurred during a time when there was no collective bargaining agreement in place.

[T]he matter was discussed during negotiations when the Union proposed to that [sic][HM] provide amnesty to striking employees involved in illegal incidents during the strike or that [HM] agree to arbitrate the matters. [HM] did not agree to either amnesty or arbitration.

(J. A.# 9.)

By letters dated July 13, 2001, the Union provided notice to HM that it intended to forward the grievances to arbitration. *See* (Compl. ¶¶ 9,10; Answer ¶¶ 9, 10; J.A. # 11). By letter dated August 6, 2001, HM informed the Union that it would not agree to arbitrate the grievance. (Compl. ¶¶ 9,10; Answer ¶¶ 9, 10; J.A. at # 12).

On November 20, 2001, the Union filed its Complaint seeking an order compelling HM to arbitrate the grievances. (Compl.) The instant motions ensued.

## II. STANDARD OF REVIEW

■■■ Summary judgment is proper where there lacks any genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering such a motion, the court must review all of the evidence in the record. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord Graham–Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 556–57 n. 7 (6th Cir.2000). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

■■■ "A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (quoting FED. R. CIV. P. 56(c)). The movant meets this burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 609 (6th Cir.2002) (quoting *Celotex*, 477 U.S. at 324–25, 106 S.Ct. 2548). The non-movant then "must set forth specific facts showing that there is a

"alphabetical rotation method." *Compare* (CBA I, Article IX § 3(B)) *with* (CBA II, Art. IX § 3(B)).

genuine issue for trial." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

■ "The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989) (quoting *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505). "A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

## III. LAW AND ANALYSIS

### A. The Presumption of Arbitrability

■ Section 301 of the Labor Management Relations Act, codified at 29 U.S.C. § 185, authorizes federal courts to create a body of federal labor law to govern the interpretation and enforcement of collective bargaining agreements, consistent with, among other goals, the clear congressional policy in favor of agreements to arbitrate labor disputes. *See Textile Workers Union of America v. Lincoln Mills of Ala.,* 353 U.S. 448, 455, 458–59, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Before ordering specific performance of an agreement to arbitrate, the court must determine whether the parties have agreed to arbitrate the particular matter at issue. *See AT & T Technologies v. Communications Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). "It is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances ...." *AT & T,* 475 U.S. at 651, 106 S.Ct. 1415. In proceeding with this analysis, "there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assur-

ance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Wright v. Universal Mar. Serv. Corp.,* 525 U.S. 70, 78, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998) (citations and internal quotations omitted).

### B. The Motions for Summary Judgment

The issue posed by the instant motions is straightforward—whether the Union may utilize CBA II's grievance and arbitration procedures for terminations resulting from strike-related conduct. Nevertheless, HM presents multiple, conflicting, and at times, irrelevant, arguments in an effort to defeat the presumption in favor of arbitration. For example, HM devotes a great measure of its supporting memorandum to arguing that the arbitral provisions of CBA I expired on May 9, 2001, thereby precluding arbitration of subsequent strike-related grievances. *See* (Dkt. # 24, Mem. In Support at 7) ("Since the Prior Union Contract ceased effective May 9, 2001, Defendant is under no obligation to agree to arbitrate such matters."). While the Court acknowledges that HM's assertions comport with the holdings of the United States Supreme Court in *Litton Fin. Printing Div. v. NLRB,* 501 U.S. 190, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991) and its progeny, *see, e.g., South Central Power Co. v. Int'l Bhd. of Elec. Workers Local Union 2359,* 186 F.3d 733 (6th Cir.1999); *Int'l Bhd. of Teamsters, Local Union 1199 v. Pepsi–Cola General Bottlers, Inc.,* 958 F.2d 1331 (6th Cir.1992), the issue of CBA I's applicability to grievances is irrelevant to the case *sub judice.* Rather, the dispositive issue before this Court addresses the applicability of CBA II to the strike-related conduct. *See* (Dkt. # 31, Pl.'s Response Mem. on Summ. J. at 1) ("The Union never claimed the Employer was required to arbitrate the grievances under [CBA I]. Instead, as the Union's motion makes

clear, the Employer *was* obligated to arbitrate the grievances under the current (2001–2004) agreement."). Consequently, the Court shall limit its examination to those arguments pertaining to the applicability of CBA II.

HM presents two arguments addressing the applicability of CBA II's arbitral provisions: (1) the parties did not execute CBA II until the close of the strike; therefore, the arbitral provisions contained therein are inapplicable to conduct occurring during the strike; and (2) the parties expressly agreed that CBA II's arbitral provisions were inapplicable to the strike-related conducts as evidenced through their failure to reach an agreement as to the Amnesty proposal. The Court shall address each argument in turn.

*The Effective Date of CBA II*

■■ HM's initial argument requires little attention as it misrepresents the facts before the Court. As discussed *supra*, it is undisputed that Acevedo and Hollis engaged in the alleged misconduct on May 15, 2001. *See* (Dkt. # 23, Mem. In Support at 2–3; Dkt. # 24, Mem. In Support at 2; Doll Dep. at 6–7, 28–29, 38; King Dep. at 14, 23; Seals Dep. at 13–17; Norris Dep. at 12; J.A. ## 7 & 8). CBA II's express terms render its provisions effective from May 10, 2001 through May 24, 2004. *See* (CBA II, Art. XXXI). Furthermore, CBA II lacks any provision excluding strike-related conduct from the grievance and arbitral procedures. Consequently, CBA II governed the parties' relationship during the events giving rise to the grievance. Simply, all strike-related conduct became subject to the terms of CBA II as a result of the parties' decision to "back-date" the effective date of CBA II. *See Mail–Well Envelope v. Int'l Assoc. of Machinists and Aerospace Workers, Dist. 54,* 916 F.2d 344, 346 (6th Cir.1990) (holding that an employer and union have the authority to subject strike-related con-

duct to a new collective bargaining agreement's grievance and arbitration procedures).

■■■■ HM nonetheless presents the spurious contention that CBA II's arbitral provisions are inapplicable to the grievances because "none of the material facts at issue occurred during the term of [CBA II], as it was not executed until January 31, 2002." (Def.'s Mem. In Opp'n To Pl.'s Mot. for Summ. J. at 5.) It is undisputed that the parties entered into a tentative agreement on May 22, 2001; the Union ratified the tentative agreement on May 23, 2001; and the parties executed the final document on February 5, 2002. *See* (CBA II at 77.) HM's suggestion that the February 5, 2002 execution date governs the parties' relationship errs as a matter of law and reason. First, it is apodictic that a collective bargaining agreement becomes effective on the date that the parties select. *See Mail–Well Envelope,* 916 F.2d at 346. In addition, it is a well-settled principle of contract interpretation that a contract must be interpreted when possible as a whole in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions. *See International Union v. Yard–Man, Inc.,* 716 F.2d 1476 (6th Cir.1983); *see also Cincinnati Typographical Union No. 3, Local 14519 v. Gannett Satellite Info. Network, Inc.,* 17 F.3d 906, 909 (6th Cir.1994).

Here, Article XXXI of the CBA expressly provides that "[t]his Agreement shall become effective at 12:01 a.m. on May 10, 2001, and shall remain in full force and effect until 12:01 a.m. May 24, 2004." (CBA II, Art. XXXI.) Should the Court adopt HM's proposed execution date rationale, the effect is to nullify an expressly stated provision of the parties' contract. Such a result is an impermissible manner of contract interpretation. *See Maurer v.*

*Joy Technologies, Inc.*, 212 F.3d 907, 918 (6th Cir.2000).

Beyond the legal rationales for rejecting the HM's execution-date theory, the argument defies reason as it would require the Court to determine that the parties: (1) agreed to "back-date" the CBA a matter of two weeks; (2) ignored any concern over a gap between CBA I and CBA II for a period of seven months; and (3) meanwhile operated in the interim without a CBA governing the employment relationship. The Court declines the invitation to reach this unreasonable conclusion, particularly a conclusion that is in such patent contradiction to the parties' express agreement.

Accordingly, the Court determines that the express terms of CBA II render its provisions applicable to events occurring on May 10, 2001 and thereafter. Therefore, the arbitral provisions of CBA II apply to the conduct giving rise to greivances.[8]

*The parties' purported agreement to exclude strike-related conduct from CBA II's arbitral provisions*

In an effort to overcome CBA II's express applicability to the grievances, HM asserts that the parties' failure to reach an agreement on the Amnesty proposal demonstrates that HM refused to arbitrate any grievances arising from strike-related conduct. HM's argument misses the mark in several respects.

■■■ First, in order to accept HM's argument, the Court must rely on extrinsic evidence to interpret CBA II. The Court may consider extrinsic evidence of the parties' intent at the time of execution if the collective bargaining agreement is ambiguous. *See Int'l Union, United Mine Workers of America v. Apogee Coal Co.*, 330 F.3d 740, 744 (6th Cir.2003) (citations omitted). "Whether the language of a written agreement is ambiguous is a question of law that 'may be resolved summarily.'" *Id.* (citing *Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir.1993)) (further quotation and citation omitted).

Here, the extrinsic evidence necessarily consists of the discussions between the parties during May 21—22, 2001 relating to the Amnesty proposal. HM fails, however, to direct the Court to any ambiguity in CBA II that this extrinsic evidence assists in clarifying. Indeed, the parties expressly provided in CBA II that their agreement:

> [E]mbod[ies] the complete and final understanding reached by the parties as to wages, hours, and all other terms and conditions of employment of all employees covered by the Agreement. The parties acknowledge and agree that they have had an opportunity to present and bargain about contract proposals on any subject they deemed appropriate during the negotiations leading to this Agreement.... Neither party intends to be bound or obligated except to the extent that it is strictly so agreed herein, and this Agreement shall be strictly construed.

(CBA II, Art. XXVIII § 3.)

■■ "Carefully written, well-reasoned, and thoroughly negotiated contracts are presumptively complete, and the added presence of a merger clause is further strong evidence 'that the parties intended

---

8. In light of the Court's conclusion as to CBA II's effective date, the Court has no occasion to resolve whether the date giving rise to the grievance is May 15, 2001 (the date of the conduct), May 29, 2001 (the effective date of the terminations), or June 14, 2001 (the date Acevedo and Hollis received notice of the terminations). *See* (Dkt. # 23, Mem In Support at 10–13; Dkt. # 24, Mem In Support at 14). The express terms of CBA II govern under any of the proposed dates.

the writing to be the complete and exclusive agreement between them.'" *Anheuser–Busch, Inc. v. Local Union No. 744,* 280 F.3d 1133 (7th Cir.2002) (quoting *Regensburger v. China Adoption Consultants, Ltd.,* 138 F.3d 1201, 1206 (7th Cir. 1998)). The instant parties inclusion of the foregoing merger clause manifests their intent that the agreement be strictly confined to the CBA II. Absent any evidence of an ambiguous provision in CBA II that HM seeks to challenge, the court shall not rely on extrinsic evidence. Rather, the just-cause termination and arbitral provisions of CBA II are unequivocal and HM must agree to proceed with the grievance and arbitral procedure in resolving the Acevedo and Hollis terminations.

 Assuming *arguendo,* however, that the Court were inclined to rely on extrinsic evidence, the record before the Court supports a finding that the Court must compel arbitration. The record demonstrates that various members of the parties' negotiating teams attributed different interpretations to King's statement to "let the system work." The Union representatives interpreted this statement to refer only to the criminal charges as the Union representatives were unaware that HM intended to discipline Acevedo and Hollis. *See* (Doll Dep. at 44–46; Colello Dep. at 24, 26). Indeed, Doll enquired as to whether HM intended to discipline Acevedo and Hollis and HM's representatives responded that they had not reached a decision regarding discipline. *See* (Doll Dep. at 44, Colello Dep. at 21; Seals Dep. at 19). On the other hand, HM's representatives believed King's statement to refer to any action taken against Acevedo or Hollis, including termination. *See* (King Dep. at 22,25; Seals Dep. at 24–25). Notwithstanding the varying inferences and conclusions to be drawn from the conflicting accounts of the negotiation sessions, one issue remains uncontroverted; that is; the parties reached no agreement in any

manner as to the Amnesty proposal. *See* (Doll Dep. at 47; King Dep. 38; Seals Dep. at 25; Colello Dep. at 29). Thus, assuming the Court were inclined to rely on extrinsic evidence, this evidence does not lead to Court to conclude with "positive assurance" that the arbitration clause of CBA II is inapplicable to the grievance. *Accord Detroit Typographical Union, Local 18 v. Detroit Newspaper Agency,* 283 F.3d 779 (6th Cir.2002).

Accordingly, HM fails to overcome the presumption of arbitrability and the Court shall compel arbitration.

## IV.

For the foregoing reasons, the Court hereby orders that the Plaintiff's Motion for Summary Judgment (Dkt.# 23) is **GRANTED.** The Court further orders that the Defendant's Motion for Summary Judgment and Memorandum In Support (Dkt.# 24) is **DENIED.**

**IT IS SO ORDERED.**

### JUDGMENT ENTRY

This matter is before the Court upon the parties' cross-motions for summary judgment. (Dkt. # 23; Dkt. # 24.)

For the reasons set forth in the Memorandum Opinion and Order issued contemporaneously herewith, and incorporated herein by reference, the Plaintiff's Motion for Summary Judgment (Dkt.# 23) is **GRANTED.** The Defendant's Motion for Summary Judgment and Memorandum in Support (Dkt.# 24) is **DENIED.** Accordingly, **JUDGMENT** is entered in favor of the Plaintiff, Local 377 Chauffeurs, Teamsters, Warehousemen, and Helpers of America.

**IT IS SO ORDERED.**