**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0422n.06

Filed: July 16, 2008

No. 07-3528

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| SAMMIE GILES, Jr., | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | |
| | ) | **ON APPEAL** FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| THE UNIVERSITY OF TOLEDO, | ) | DISTRICT OF OHIO |
| ALAN G. GOODRIDGE, JAMES M. | ) | |
| SCIARINI, GANAPATHY | ) | |
| NAGANATHAN, DANIEL M. | ) | **O P I N I O N** |
| JOHNSON, | ) | |
| | ) | |
| **Defendants-Appellees.** | ) | |
| _____ | ) | |

Before:  SILER, MOORE, and McKEAGUE, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.**  Dr. Sammie Giles, Jr., Ph.D. ("Giles")

appeals the grant of summary judgment, on all of his claims, to the University of Toledo and four

individuals in its administration whom Giles sued in both their official and individual capacities:

Alan G. Goodridge, James M. Sciarini, Ganapathy Naganathan, and Daniel M. Johnson.  Giles

alleged that "one or more" of the Appellees had subjected him to disparate treatment based on race,

retaliated against him for engaging in protected activities, wrongfully discharged him in violation

of Ohio public policy, and violated his rights under 42 U.S.C. §§ 1983 and 1985 and Ohio Revised

Code § 4112.  Also, Giles appeals the district court's denial of his motion for partial summary

judgment as to whether a collective-bargaining agreement ("CBA") between the University of

Toledo and the American Association of University Professors, University of Toledo Chapter ("the union") covered him. For the following reasons, we **AFFIRM** the district court's judgment for the University and its administrators on all of Giles's claims.

## I. BACKGROUND

Giles, an African-American, became an Associate Professor of Electrical Engineering at the University of Toledo in 1987; he became a tenured professor in 1991-1992. Giles sought opportunities to gain experience that would "enhance [his] credentials for advancement at the University of Toledo in the event of future department chair openings." Joint Appendix ("J.A.") at 333-34 (Giles Aff. at ¶ 8). In a letter dated September 18, 2000, Giles wrote to the Dean of the College of Engineering, Ronald Fournier ("Fournier"), requesting "at least a two-year leave of absence without pay starting January 1, 2001," in order "to lead a department at Tuskegee University." J.A. at 636 (Giles Ltr. to Dean Fournier). Giles alleges that Vice Provost for Faculty Development, Dr. Earl Murry ("Murry"), orally granted him three years of leave; Murry confirmed this in his affidavit. However, Murry, by letter dated November 3, 2000, stated that the leave would be "effective January 1, 2001 through December 31, 2001." J.A. at 637 (Murry Ltr. Approving Giles's Leave for 2001). Murry added that if the second year of leave that Giles requested became "necessary after the conclusion of the first year," Giles should make another request and the "matter [would] be decided administratively with respect to other considerations affecting the University." *Id*. Murry, also an African-American, stated that his oral statement to Giles differed from his written statement because he feared that if he approved all three years it would be seen as "racial favoritism." J.A. at 323 (Murry Aff. at ¶ 16).

2

Giles used his approved leave of absence in 2001 to take a position at Tuskegee University; he became a full-time employee of Tuskegee University on January 1, 2001. The University of Toledo approved Giles's leave of absence again for 2002. However, the University of Toledo denied Giles's request for a third year of leave. In a July 2002 email and September 2002 letter, Dean Ganapathy Naganathan ("Naganathan"), informed Giles that his request for a third year-long leave of absence for 2003 was denied because it violated the CBA between the faculty and University. The Interim Assistant Vice President for Faculty Labor Relations, Kevin West ("West"), Provost and Vice President for Academic Affairs, Alan Goodridge ("Goodridge"), and Associate Vice President for Human Resources, Jim Sciarini, agreed.

On September 28, 2002, Giles wrote to his department chair at the University of Toledo, Demetrios Kazakos, to inform him that he "intend[ed] to return to The University of Toledo at the expiration of [his] leave." J.A. at 644 (9/28/02 Giles Ltr. to Kazakos). However, on December 18, 2002, Giles wrote to Dean Naganathan by email to inform him that he would not return to the University of Toledo in January 2003 "due to an unexpectedly good offer" from Tuskegee University. J.A. at 645 (12/18/02 Giles Email to Naganathan). Dean Naganathan replied that they would "miss" Giles and asked that he produce a formal letter if his intention was to resign. J.A. at 645 (12/19/02 Naganathan Email to Giles). Giles contacted Murry about the denial of his third year of leave; Murry assured him that, when Murry returned from administrative leave, he would "straighten out the matter." J.A. at 337 (Giles Aff. at ¶ 18).

Giles stated in his affidavit that he "saw nothing in the collective bargaining agreement which would prohibit the University from giving me a second leave of up to two years back-to-back with the two years I had already used." J.A. at 336 (Giles Aff. at ¶ 14). However, because Giles did not

3

want to continue the debate over the correct interpretation of the CBA, he gave Naganathan "three instruments: a new leave of absence request, a retirement request, and a resignation letter." J.A. at 647 (12/21/02 Giles Ltr. to Naganathan); J.A. at 648-50 (Signed Giles Ltrs.). He informed Naganathan that he preferred to be given a new leave-of-absence or a combination of leave plus retirement. When "it became apparent" to Giles after a phone conversation with Naganathan that he "did not intend to give meaningful consideration to either of [his] first preferences," Giles "retracted [his] tendered resignation" by sliding a letter under the door of the President of the University on December 24, 2002. J.A. at 337 (Giles Aff. at ¶¶ 18-19). The University honored the retraction of his resignation.

Subsequently, the University of Toledo granted Giles's request for FMLA leave. His psychologist submitted documentation indicating that he would be "unable to work during the leave." J.A. at 654 (Certification of Health Care Provider at 1). Although Giles did not work at the University of Toledo, the record reveals that he continued to work at Tuskegee University while on FMLA leave at Toledo.

The University of Toledo administration sent Giles a letter on June 23, 2003 that terminated his medical leave as of May 2, 2003, unless he produced further documentation, and "requir[ed]" his "return to duties at The University of Toledo by August 18, 2003." J.A. at 665 (6/23/03 West Ltr. to Giles). The letter stated that if he failed to return to work, he would "face termination of [his] employment." *Id*. at 665-66. Giles responded in July 2003 that he would "not be available to teach a class at UT this calendar year," and that he "no longer wish[ed] to be a member" of the University's union for tenured faculty. J.A. at 667 (7/13/03 Giles Ltr. to West).

4

Citing its rights under the CBA Article 17.0, the University informed Giles in October 2003 that it was instituting an investigation that could lead to "corrective action," based on his "refusal to return to duty and the abandonment of [his] faculty position." J.A. at 668 (10/15/03 West Ltr. to Giles). In an email sent on November 28, 2003, Giles told Naganathan and West that he "would like to return to UT within the next four (4) years." J.A. at 670 (11/28/03 Giles Email to West, Naganathan, Goodridge). West responded by letter:

> Your refusal to return to your University assignment along with your requested delay in returning constitutes Insubordination and Job Abandonment. The University indicated in a June 23, 2003 letter you were instructed to return to your assignment beginning with the Fall Semester 2003. You did not return. After a review of the circumstances on November 6, 2003, the Dean of Engineering repeated the University's desire to have you immediately return to your faculty duties in Toledo. The University of Toledo received your November 28, 2003 email which indicated that you did not plan to immediately return to the University of Toledo to resume your professional assignment. Your email clearly indicates that you will not be returning to the University at any acceptable time.

J.A. at 671 (12/9/03 West Ltr. to Giles). West informed Giles that a "pre-disciplinary hearing" would be held on December 22, 2003 pursuant to Article 17.0 of the CBA; the letter notified him that he could be accompanied by a representative if he so chose because the purpose of the hearing would be to allow him to "discuss and respond to the charges that [his] actions constitute[d] insubordination and job abandonment, which warrant[ed] [his] dismissal for cause." *Id*.

The University of Toledo postponed the hearing while Giles obtained counsel. However, after not receiving any communication from him between December 22, 2003 and January 8, 2004, the University of Toledo sent him an email indicating that the hearing would take place on January 20, 2004; neither Giles, nor a representative for him, appeared on January 20. West sent Giles a letter in January 2004 and again in March 2004 to coordinate a time for the pre-disciplinary hearing;

5

West received a response in late March requesting an extension until May and provision of certain documents. The University agreed to both requests. Giles filed an EEOC complaint in April 2004.

The Provost, Goodridge, presided over Giles's pre-disciplinary hearing held on October 20, 2005. Giles's attorney and West made opening and closing statements, and Giles was given an opportunity to respond to the charges of job abandonment and insubordination for refusal to return to work on June 23, 2003; Giles also chose to question Murry. J.A. at 239 (1/13/06 Goodridge Ltr. to Giles at 1). Goodridge noted Giles's objections to the fact that Goodridge was presiding over the hearing, but stated that it was his "responsibility to convene a pre-disciplinary hearing that may result in the termination of a faculty member" because he was the "Senior Academic Officer of the University." J.A. at 243 (1/13/06 Goodridge Ltr. at 5). Goodridge noted that this was not an "evidentiary hearing," but rather one in which Giles could respond to the charges against him. J.A. at 244 (1/13/06 Goodridge Ltr. at 6). The University did not present witnesses, only documents; it did not allow a court reporter. J.A. at 244 (1/13/06 Goodridge Ltr. at 6). Goodridge concluded that even if Murry had orally approved a three-year leave, Murry had no authority to violate the CBA. The President of the University of Toledo reviewed Goodridge's letter, and issued a "Notice of Dismissal for cause, effective March 17, 2006, for the reasons of insubordination and job abandonment." J.A. at 253 (Notice of Dismissal).

## A. The 1998 and 2000 Collective-Bargaining Agreements

The University and the American Association of University Professors - University of Toledo Chapter ("the union") entered into a CBA in 1998, as they had every few years since 1993. The union consisted of "regular, full-time faculty" from 1998-2000, J.A. at 465 (1998 CBA at 2), and "tenure-track and tenured full-time faculty" from 2000-2003, J.A. at 473 (2000 CBA at 2); neither

6

the 1998 nor the 2000 CBA included "College of Law faculty, temporary faculty, part-time faculty, superannuates," managerial, supervisory, or other employees. J.A. at 465 (1998 CBA at 2); J.A. at 473 (2000 CBA at 2).

In 2000, the University's interim President sought to extend all of the CBAs to which the University was a party; tenured faculty elected not to accept this extension and proceeded to negotiations. On April 14, 2000, the "Chief Negotiators" for the University and the union signed a Mutually Agreed-Upon Dispute Settlement Procedure ("MAD") agreement, which extended the 1998 CBA (which was set to expire on June 30, 2000) until December 31, 2000. J.A. at 144-45 (MAD at 1-2). Giles argues that the record does not indicate that the agreement was ratified by the Board of Trustees or the union. The parties stipulated that the 2000 CBA was signed on January 16, 2001. The parties gave the 2000 CBA a retroactive effective date of July 1, 2000 in order to ensure seamless CBA coverage. Both the 1998 and the 2000 CBAs contained identical language regarding leaves of absence (which the CBAs distinguished from vacation, medical leave, jury duty, sabbatical leave, and holidays):

> 14.3.1 Members may request leave of absence without pay for any purpose mutually agreed to by the University and the member. Such leave shall normally be for one (1) calendar year or less, but may be extended by mutual agreement of the University and the member. Such leave shall not exceed two (2) calendar years. Ultimate authority to grant such leave is discretionary with the Board. Ninety (90) days before the expiration of such a leave members must indicate in writing to their department chairperson, or other equivalent supervisor, their intention of returning to work. Once granted, a leave of absence may be shortened only at the discretion of the University. A request for such leave shall not unreasonably be denied.
>
> . . .
>
> 14.3.3 Members on such leave do not earn sick leave or vacation, but shall have the option to maintain University insurance coverages at the group rates at the member's expense. The member shall accrue seniority while on such leave.

7

J.A. at 466, 474 (1998 and 2000 CBAs, Article 14).

## B. Procedural Background

Giles filed his complaint in the United States District Court for the Northern District of Ohio on October 14, 2004, and amended it on June 14, 2006 after the University of Toledo terminated his employment. Giles filed a motion requesting "expedited" discovery regarding non-CBA leaves on September 16, 2005, J.A. at 4 (Dist. Ct. Dkt. Sheet at 17); the district court asked the parties to brief the issue of whether the CBA covered Giles (but did not enter an Order resolving this issue until the Memorandum Opinion addressing the summary-judgment motions). Giles filed a motion requesting that the assigned district judge recuse himself; the motion was referred to another district judge who denied it. However, the case was reassigned to a new district judge on April 6, 2006. The parties filed cross-motions for summary judgment in the fall of 2006.

## II. ANALYSIS

## A. Standards of Review

### 1. Summary judgment

We review a district court's grant of summary judgment de novo. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 700 (6th Cir. 2007). "[V]iew[ing] all evidence in the light most favorable to the nonmoving party," *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006), we determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific

facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

FED. R. CIV. P.56(e)(2). "Summary judgment is inappropriate when the evidence raises a genuine issue about a material fact, 'that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Wright*, 455 F.3d at 706 (quoting *Anderson*, 477 U.S. at 248).

"Although the denial of a motion for summary judgment is usually an interlocutory order that is not immediately appealable, where 'an appeal from a denial of summary judgment is presented in tandem with a grant of summary judgment, this court has jurisdiction to review the propriety of the district court's denial of summary judgment.'" *Tenn. ex rel. Wireless Income Props., LLC v. City of Chattanooga*, 403 F.3d 392, 395 (6th Cir. 2005) (quotations omitted). "While the denial of a motion for summary judgment 'on purely legal grounds' is reviewed de novo, a denial based on the finding of a genuine issue of material fact is reviewed for an abuse of discretion." *Id*. at 395-96 (quoting *McMullen v. Meijer, Inc.*, 355 F.3d 485, 489 (6th Cir. 2004)).

## 2. Discovery

This Court reviews "decisions of the district court regarding discovery for abuse of discretion." *Singleton v. United States*, 277 F.3d 864, 870 (6th Cir. 2002). "An abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Id*. (quoting *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 716 (6th Cir.1999)). "The district court does not abuse its discretion in denying discovery when the discovery requested would be irrelevant to the underlying issue to be decided." *Green v. Nevers*, 196 F.3d 627, 632 (6th Cir. 1999) (citation omitted).

9

**B. Coverage of the Collective Bargaining Agreements**

The district court held that because we have previously recognized the ability of parties to make provisions of an agreement retroactive, the 2000 CBA would apply to Giles from July 1, 2000 to July 1, 2003. Thus, the district court concluded that the terms of the CBA would require that any leave of absence be granted exclusively by the Board of Trustees and not exceed two consecutive calendar years. However, Giles argues that neither of the CBAs applied to him because "[a]ll the operative facts concerning [his] leave occurred during the *hiatus* between the CBAs." Reply Br. at 9. Giles asserts that he had a "vested" right to three years of leave. Also, Giles contends that he was not "full-time" faculty at the University of Toledo after January 1, 2001 and, therefore, was not covered by the 2000 CBA. Reply Br. at 17.

We have held that a union and an employer can contract to cover matters that occurred at earlier points in time. *Mail-Well Envelope, Cleveland Div. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. 54*, 916 F.2d 344, 346-47 (6th Cir. 1990). In other words, parties may agree to "back-date" the effective date of a newly created CBA. *Local 377, Chauffeurs v. Humility of Mary Health Partners*, 296 F. Supp. 2d 851, 859 (N.D. Ohio 2003). In addition, "'where both parties to a public employee collective bargaining agreement continue to operate as if there were a contract, and neither party breaches or indicates its intention to no longer be bound, then the *status quo* continues.'" *State ex rel. Mun. Constr. Equip. Operators' Labor Council v. City of Cleveland*, 866 N.E. 2d 1065, 1068 (Ohio 2007) (quoting *Young v. Wash. Local Sch. Dist. Bd. of Educ.*, 619 N.E. 2d 62, 64-65 (Ohio Ct. App. 1993)). Finally, in order to determine if a right vests, we look at the intent of the parties. *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 654 (6th Cir. 1996). The parties' intent is most easily

10

gleaned from the language of their agreement. *Id.* (quoting *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983), *cert. denied*, 465 U.S. 1007 (1984)).

We hold, as the district court did, that Giles was covered by one of the CBAs at all times relevant to this suit. The parties ensured that there would not be a gap in CBA coverage by creating a retroactive effective date for the 2000 CBA, a practice accepted by our precedent.[1] *See Mail-Well*, 916 F.3d at 346-47; *see also Local 377, Chauffeurs*, 296 F. Supp. 2d at 859. For these reasons, we conclude that when Giles approached the University of Toledo for a leave of absence for a third year, the University could invoke the 2000 CBA to deny him such leave.

Additionally, we hold, as the district court did, that Giles would be considered full-time, tenured faculty, even though he was on a leave of absence, because the CBA is designed to address the activities of full-time, tenured faculty (who take leaves of absence, sabbaticals, etc.). Because a leave of absence is a *type* of leave granted to full-time faculty under the CBA, one remains "full-time" faculty even if one is on a leave of absence. Simply because, for example, a faculty member is on medical leave, he or she is not excluded from the protections or responsibilities of the CBA. Also, the CBA contradicts the idea that a leave of absence constitutes a break in service; the CBA states that a faculty member will continue to "accrue seniority" while on a leave of absence. J.A. at 474 (2000 CBA at 40).

Finally, Giles's argument that he has a vested right in the three-year leave of absence is without merit. *Golden* instructs that we look at the parties' intent, which in this case is clearly stated in the CBA: a leave of absence is not guaranteed (or a right) and always requires prior approval from

---

[1]Thus, as the district court indicated, we need not "address the validity of the MAD's extension of the 1998-2000 CBA." J.A. at 73 (Dist. Ct. Op. at 9 n.2).

the Board of Trustees. Based on the foregoing, we affirm the district court's decision that a CBA covered Giles during all portions of his employment with the University of Toledo that are relevant to this suit.

## C. Scope of Discovery

The district court held that Giles would be allowed discovery only as to tenured faculty members covered by a CBA who had taken leaves of absence for more than two consecutive years. Giles argues on appeal that the district court improperly restricted discovery. We hold that it was not an abuse of discretion to limit discovery to only those faculty members subject to a CBA because faculty employed before CBAs were used may have negotiated special arrangements. In addition, the district court did not abuse its discretion when it denied Giles discovery of the records of faculty who took other types of leave. Paid sick leave, sabbaticals, vacation, jury duty, leaves of absence, medical leave, and holidays are each treated differently under the 2000 CBA. We agree with the district court's conclusion that "the CBA's treatment of different leaves indicates meaningful distinctions between unpaid leaves of absence and other forms of leave." J.A. at 82 (Dist. Ct. Op. at 18). Therefore, we hold that the district court did not abuse its discretion when it limited discovery.

## D. Disparate Treatment

Because Giles did not argue that there was direct evidence of disparate impact based on race, we analyze the claim under the burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Clay*, 501 F.3d at 703. There is no dispute between the parties about whether Giles established the first three elements of a prima facie case; Giles established that he is a member of a protected class as an African-American, was qualified for his job as a professor, and was

12

terminated by his employer. *See id*. Therefore, we focus on whether Giles can establish the fourth element: "that a person outside the protected class was treated more favorably than him." *Id*. (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir.2001)).

The district court held that Giles failed "to identify a non-protected similarly-situated person whom the University treated better than himself." J.A. at 78 (Dist. Ct. Op. at 14). Giles argues that when the district court analyzed the people whom he considered to have been treated better than himself, "the [district] court failed to seek relevant similarities, but instead demanded 'exact correlation.'" Appellant Br. at 43. In addition, Giles argues that he was not given class assignments in 2005, and that he filed a grievance that was not processed before his termination regarding the fact that Goodridge presided over his pre-disciplinary hearing.

We affirm the district court's decision. Our precedent indicates that the person identified by Giles as being treated more favorably must be similarly situated to him "'in all relevant respects,'" *Wright*, 455 F.3d at 710 (quotation omitted). However, Giles failed to identify a faculty member who received more than two consecutive years for a leave of absence. Based on the record before us, the University does not appear ever to have granted a leave of absence to a tenured faculty member for more than two consecutive years since the CBAs have been in place. The dispute here centers in part on the use of the word "consecutive." Although the University uses this word in its brief, Appellee Br. at 34, the word does not appear in the CBA's leave-of-absence policy. The policy states: "Such leave shall not exceed two (2) calendar years." J.A. at 474 (2000 CBA at 40). The clear implication of the provision, when read as a whole and in context, is that any particular leave of absence should not exceed two consecutive years (not that a faculty member is only allowed a total of two years for a leave of absence during an entire career at the University). Hugh Hinton, for

13

example, a faculty member whom Giles alleges was similarly situated, never had a leave of absence approved that was more than two consecutive years. Hinton had an approved sabbatical (which was changed to a leave of absence when he received a Fulbright scholarship), followed by a sabbatical and two years of unpaid leave. The University granted the last unpaid leave request with the condition that Hinton return to teaching at the end of that time period. Ultimately, Giles failed to identify any faculty who were similarly situated in all relevant respects.

Finally, the record does not provide information about Goodridge's participation in the investigation of the charge against Giles, nor does the record indicate that Provosts at the University do not serve as hearing administrators. In addition, we adopt the district court's conclusion that "there is no record evidence that termination is not appropriate for the charges against" Giles. J.A. at 89 (Dist. Ct. Op. at 25). Also, there is no indication in the record that the University's failure to give Giles class assignments in 2005, during the time period in which the University was considering corrective action owing to charges of job abandonment, was racially motivated retaliation. Based on the foregoing, we hold that Giles failed to establish a prima facie case of disparate treatment.

**E. Retaliation**

Because Giles did not argue that there was direct evidence of retaliation by the University of Toledo for his protected activities, we analyze the retaliation claim under the *McDonnell Douglas* burden-shifting approach. *See Clay*, 501 F.3d at 713. As with Giles's disparate-treatment claim, the parties do not dispute whether Giles meets the first three elements of a prima facie case of retaliation; Giles established that he engaged in Title VII-protected activity by filing an EEOC complaint, that his employer knew of this activity, and that his employment was terminated. *See id*. The only disagreement centers around whether he has established the fourth element: whether "there is a

14

causal connection between the protected activity and the adverse employment action." *Id.* "Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

The district court held that Giles failed to establish a prima facie case of retaliation because there was no causal connection between Giles's "filing of [his] Title VII action and his termination from the University," because Giles did not show "temporal proximity between his protected action and his adverse employment action," nor did he show that "similarly-situated faculty members were treated differently" from him. J.A. at 86-87 (Dist. Ct. Op. at 22-23). Giles argues that he "presented two examples of non-protected faculty members who had engaged in alleged or actual insubordination. One received only a reprimand; the other was not disciplined at all." Appellant Br. at 48. Either situation, argues Giles, "should have been sufficient to raise an inference that something more than alleged insubordination was at work in" Giles's discharge. Appellant Br. at 49.

We affirm the district court's holding that Giles failed to establish a causal connection. First, Giles did not provide record evidence of other tenured faculty members charged with job abandonment and insubordination by the University of Toledo. Giles argues that David Erben ("Erben") and Abid Al-Marayati ("Al-Marayati") were in situations similar to his own but were treated differently by the University of Toledo. However, the record reveals that Erben's case is quite different than Giles's case, and that there is far too little information about Al-Marayati for his case to be helpful to Giles. The University of Toledo reprimanded Erben for plagiarism only after

15

an arbitrator reversed the University's decision to terminate him based on procedural errors that occurred during the disciplinary hearing. Giles's case is quite different from Erben's not only because of the difference in alleged infractions, but also because Giles never sought to arbitrate his claim under the applicable CBA provisions. In addition, because faculty member Al-Marayati was asked to attend sensitivity training courses after he harassed an Asian female student, Giles and he were not similarly situated. Murry stated in his affidavit that Al-Marayati was "insubordinate," J.A. at 325 (Murry Aff. at ¶ 28), but did not compare and contrast the circumstances involving Al-Marayati with that of Giles such that we would consider race to account for the differences in the way in which the University approached a harassment claim as contrasted with a job-abandonment claim.

Second, under our precedent, Giles failed to establish a viable temporal connection between his protected activities and his termination. In December 2003, the University of Toledo attempted to have a pre-disciplinary hearing regarding his failure to return to his teaching position. Giles filed an EEOC complaint in April 2004, alleging that the University had denied him a leave of absence in "retaliation" for his filing other EEOC charges against the University in 1999 and 2000. J.A. at 33 (4/21/04 EEOC Compl.). He filed his complaint in federal court on October 14, 2004 regarding the denial of his leave of absence. The University terminated him effective March 17, 2006, twenty-three months after he filed his most recent EEOC charge and seventeen months after he filed his complaint in federal court. J.A. at 253 (Notice of Dismissal). Because there was a lengthy period of time between Giles's protected actions and his termination, we cannot conclude that there was a temporal connection between his protected activities and the termination of his employment.

16

Therefore, we hold that the record lacks the evidence necessary to make a prima facie case of retaliation under our existing precedent.

## F.  42 U.S.C. § 1983 Claim

The district court held that Giles failed to "plead a cause of action under Section 1983 against the individual Defendants."  J.A. at 92 (Dist. Ct. Op. at 28).  Giles argues that under *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), he was not required to plead every element of the § 1983 claim; he argues that the Defendant-Appellees should have moved for a more definite statement under Rule 12(e) if they were unclear as to the meaning of his complaint.[2]  Also, Giles argues that there is a fact question as to whether the "individual defendants acted outside of their official capacities when they formulated a new CBA interpretation and applied it only to the Plaintiff."  Appellant Br. at 58.

We affirm the district court's decision.  Although *Swierkiewicz* held that making a prima facie case under *McDonnell Douglas* "is an evidentiary standard, not a pleading requirement," *Swierkiewicz*, 534 U.S. at 510, the issue in this case is whether the individual defendants had notice that they were being sued under § 1983—not whether the elements of a claim had been presented in the complaint.  Thus, *Swierkiewicz* is not on point.  In addition, as the district court noted, Giles stated explicitly that both the individuals and the University were being sued in his claims of racially hostile environment (¶ 36), retaliation (¶¶ 38-39), § 1981 (¶ 41), § 1985 (¶ 45), violation of the Ohio Code (¶ 47), and violation of Ohio public policy (¶ 49).  J.A. at 49-53 (Amended Compl. at 12-16).  There was nothing in the text of the § 1983 claim to indicate, as in the other claims previously listed,

---

[2]Giles did not appeal the district court's finding that the University was an arm of the State and therefore immune to his 42 U.S.C. § 1983 claim.

17

that the individual defendants were included. For these reasons, we affirm the district court's decision; thus, we need not reach the question of whether the individuals stepped outside of their official capacity at some point.

**G. 42 U.S.C. § 1985 Claim**

"A civil conspiracy is 'an agreement between two or more persons to injure another by unlawful action.'" *Farhat v. Jopke*, 370 F.3d 580, 599 (6th Cir. 2004) (quoting *Weberg v. Franks*, 229 F.3d 514, 526 (6th Cir. 2000)). We affirm the district court's holding that, because Giles failed to show that the University committed an unlawful action, he could not prove the elements of his civil-conspiracy claim.

**H. Ohio Revised Code § 4112 Claim**

Caselaw interpreting "'Title VII of the Civil Rights Act of 1964, Section 2000(e) et seq., Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112.'" *Greer-Burger v. Temesi*, 879 N.E. 2d 174, 180 (Ohio 2007) (quotation omitted). We agree with the district court that because Giles failed to establish the federal claims above, he failed to establish a claim under the OHIO REV. CODE § 4112. Giles has not presented anything unique about this case that would cause the analysis under the Ohio Code to be any different than that under federal law.

**I. Ohio Public Policy Claim**

In order to bring a claim for wrongful discharge in violation of Ohio public policy, Giles would need to be an "employee at will," meaning that either the University or Giles could "terminate the employment relationship for any reason which is not contrary to law." *Haynes v. Zoological Soc'y of Cincinnati*, 652 N.E. 2d 948, 951 (Ohio 1995). We affirm the district court's determination that Giles cannot bring this claim because he was subject to the 2000 CBA, as established above, and

18

therefore remained a member of the faculty during his leave of absence; Giles was not an at-will employee.

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the grant of summary judgment to the defendants and the denial of partial summary judgment to Giles.