NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0727n.06
Filed: November 24, 2008

No. 07-6232

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DIANA CECIL, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF KENTUCKY |
| | ) | |
| LOUISVILLE WATER COMPANY; JOHN L. | ) | **O P I N I O N** |
| HUBER; GREGORY C. HEITZMAN, Vice- | ) | |
| President; ROBERT K. MILLER, Vice-President; | ) | |
| MICHAEL STURGEON, Human Resources; JOHN | ) | |
| ANDERSON; RONALD D. EILER, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE:     KENNEDY, SUTTON, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.**     At oral argument, counsel for appellant Diana Cecil analogized her client's case to a pointillist painting,[1] in which each allegedly discriminatory incident is a tiny dot in the bigger picture of disparate treatment, hostile work environment, and retaliation by her former employer, the Louisville Water Company ("LWC"). Because we are unable to perceive anything but broad brush strokes and general, conclusory allegations, we **AFFIRM** the district court's grant of summary judgment in favor of LWC.

---

[1]"Pointillism" is a technique of painting using tiny dots of various pure colors, which when viewed from a distance are blended by the viewer's eye. OXFORD ENGLISH DICTIONARY (3d ed. 2006). It was developed particularly by French neo-impressionist painters as a means of producing luminous effects. *Id.*

**I**

**A.  Factual Background**

In October 2001, LWC, a municipal water utility, hired Cecil as a Right of Way Associate. She was responsible for drafting deeds of easement and purchase agreements, and for meeting with property owners to obtain the easements on which LWC installed its water facilities.  At the time of her hire, Wayne Kimbel, a male, also worked as a Right of Way Associate.  Cecil's "process owner," or supervisor, was Ron Eiler.

Almost immediately, Cecil became unhappy with her employment at LWC.  She claims Eiler assigned her administrative work and never asked Kimbel to complete similar clerical tasks.  She also testified that Eiler would leave files or envelopes on her desk in the morning, but would personally go over plans and explain projects with Kimbel.  In April 2002, Cecil claims she volunteered for the River Bank Infiltration ("RBI") project—a high-profile capital project—but that Eiler awarded the project to Kimbel and assigned Cecil a statistical cost analysis project instead.  She alleges her project was "unattainable" because the necessary statistics had not been compiled.  When she asked for help on the project, she claims Eiler denied her request and mocked her.

Cecil also argues that Eiler consistently denied her training.  While she received no training at the beginning of her employment, Kimbel attended a negotiations seminar.  Kimbel also received field training with the survey crew in 1999 and training on booster station placement in 2004.  At one point, in February 2002, Cecil obtained permission to schedule a field training to visit construction sites.  Eiler apparently pulled the training and offered it to Kimbel.  Another time, in

April 2002, Cecil claims she requested survey training to better understand engineering plans. After denying it, Eiler apparently stated "You just want to play in the dirt!"

Cecil further alleges that she was subjected to "open mockery and verbal abuse" by Eiler and other male LWC employees. Early in her employment, Eiler told her that she "dressed too nice" and that she would "intimidate property owners" if she dressed that way in the field. After Eiler denied her survey training in April 2002, Cecil claims he laughed and said she reminded him of Lisa Douglas, Eva Gabor's character on the television show Green Acres. This humiliated her because the character was a dim-witted, overly-dressed woman in a rural environment. Another LWC employee, Sheila Lowe, contends that on various occasions Eiler said the field was no place for a lady, and that there were spiders and snakes out there. Further, in May 2002, LWC's Vice President of Human Resources, James Wehrle, told two male co-workers to "pass it around that Diana is easy."

Cecil also claims the male employees at LWC embarrassed and intimidated her. She alleges that Eiler constantly monitored the arrival and departure times of the women he supervised. She alleges that Eiler treated her unpleasantly, humiliated her, and told her to talk to Debra Vaughn, another employee in the Right of Way department, whenever she asked for help.[2] In January 2002, Cecil claims two male survey technicians stood over her until she produced a file for a land surveyor, Brian Bobbitt. Apparently, Eiler knew she did not have the file, but he did not intervene. In March 2002, Cecil also alleges Eiler became angry and embarrassed her in a company meeting. Finally,

---

[2]Vaughn also filed a lawsuit against LWC, alleging disparate treatment, hostile work environment, and retaliation. *See Vaughn v. Louisville Water Co.*, No. 3:03CV-541-S, 2007 WL 2746669 (W.D. Ky. Sept. 18, 2007). Vaughn's appeal from the district court's grant of summary judgment in favor of LWC is also before this court.

Cecil claims that one of the project engineers, Anthony Hewitt, refused to accompany her to a job site early in her employment. In April 2002, after she had an unpleasant encounter on a job site with Hewitt, Eiler apparently refused to speak to him about his behavior.

In May 2002, after Wehrle's comment about being "easy," Cecil discussed her difficulties with Debra Vaughn. Vaughn told Rhonda Plunkett, LWC's Director of Cultural Diversity. Plunkett then discussed the complaint with John Anderson, LWC's Employee Relations Manager. Anderson met with Cecil and began an investigation. On September 6, 2002, Anderson cited Eiler with a code of conduct violation.[3] He referred to Eiler's "inappropriate and unnecessary comments and statements that leave a 'perception' of unacceptable biases towards certain individuals and/or groups of people." J.A. at 254.

A few days after Anderson cited Eiler with a violation, Cecil claims another process owner, Patti Kaelin, told her that Eiler was writing derogatory remarks about her and other female employees in the margins of "green bar sheets," the payroll sheets that were distributed on the floor. Cecil claims she reported this. The same day, Eiler was removed from his position and was later transferred to a resource coordinator position, apparently due to a reorganization of the Right of Way Department.

Cecil contends that after Eiler's reassignment, he continued to harass her. He was permitted to remain in the same location for over a month, even though he should have been in a different

---

[3]Section 1.1 of the LWC Employee Code of Conduct and Performance Policy provides that employees shall "[m]aintain quality and performance standards." J.A. at 268.

building. Even after he relocated in November 2002, Cecil claims Eiler periodically visited her floor for no apparent business purpose.

Project managers and engineers were also apparently uncooperative and refused to work with Cecil after Eiler was transferred. Cecil contends Anthony Hewitt was so angry that he stopped speaking to her. In October 2002, she apparently reported this to her new process owner, Cindy Kowalski, who told her that she would have to wait until emotions settled and Hewitt was able to work through it. She alleges that she addressed her problems with the project managers in a meeting with Greg Heitzman, the Senior Vice President of Operations. Heitzman apparently told Cecil that was the "ripple effect" and that she should have thought about it before she came forward.

Cecil also claims she received a negative performance review and was excluded from a meeting in October 2002 as retaliation for complaining about Eiler.

On January 9, 2003, Cecil filed a charge against LWC with the Equal Employment Opportunity Commission ("EEOC"), alleging sex discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. On April 5, 2004, she filed a complaint of discrimination with the Department of Labor, Office of Federal Contract Compliance Programs ("OFCCP"). On June 10, 2004, the OFCCP informed her that it had notified LWC of her complaint and would begin an investigation.

Cecil alleges various acts of retaliation that occurred after she complained to the EEOC and OFCCP. In October 2003, after returning from medical leave, her tank site and easement acquisition duties were reassigned to a part-time contract employee, David Benedict. Her tank site duties were ultimately removed from her responsibilities in June 2004. Cecil also alleges that in March 2004,

she was required to relocate her desk so that she was adjacent to Eiler's immediate supervisor, which made her uncomfortable. In June 2004, she claims she was excluded from a plant tour. In August 2004, after the OFCCP on-site investigation, Cecil received an unsatisfactory review from her then-process owner, Patti Kaelin. She also alleges that in April 2005, Kaelin set unattainable goals for her by proposing that she acquire eighty easements for the year. Finally, throughout this time, Cecil claims she received threatening phone calls and that LWC employees stalked her.

Cecil also alleges that the discipline she received was retaliatory. On July 2, 2004, Cecil was warned for an outburst at a June 2004 meeting in which she disagreed with Kaelin over proposed language in an easement agreement. She was not formally disciplined for this conduct. Cecil was cited on July 15, 2004 with a Class I violation for violating LWC's tardiness policy.[4] On July 16, 2004, she was assessed another Class I violation for leaving her work station during work hours.[5] Cecil received only a 1% salary increase in 2005 due to her two Class I violations.[6] She was again cited for tardiness on October 7, 2005.

---

[4]Under section 1.28 of the LWC Employee Code of Conduct and Performance Policy, employees are expected to "[m]aintain an acceptable attendance and punctuality record as a condition of employment, including reporting promptly to the assigned workstation at the assigned start time . . . and following the Company's Tardiness standard." J.A. at 270. "Tardiness is defined as 10 minutes beyond the assigned start time." J.A. at 272.

[5]Section 1.30 of the LWC Employee Code of Conduct and Performance Policy requires employees to obtain permission before leaving an assigned work station during work hours.

[6]Initially, Cecil received a 0% increase because LWC mistakenly indicated that she was assessed a Class II violation in 2004. The company revised its findings and ultimately determined that she was entitled to a 1% increase because she was assessed two Class I violations in 2004.

Cecil's employment with LWC ended on November 2, 2005.  The company claims she was discharged because she refused to sign a Post-Decisional Leave Statement and a Personal Quality Improvement Commitment ("PQIC") Statement, or "last chance agreement," related to her second violation of LWC's tardiness policy.

**B. Procedural History**

After receiving a right to sue letter from the EEOC, and while she was still employed at LWC, Cecil timely commenced this action in the United States District Court for the Western District of Kentucky.[7]  She asserted claims of gender discrimination, hostile work environment, and retaliation.  On two occasions thereafter, LWC's Chief Executive Officer, John Huber, sent an email to all LWC employees informing them of the discrimination lawsuits filed against the company.

After completion of discovery, and after Cecil had been discharged, LWC moved for summary judgment on all claims.  Before the district court ruled on the motion, the OFCCP issued a Notification of Results of Investigation ("NORI") stating that it had found sufficient evidence to conclude that sexual harassment had occurred and a hostile work environment existed at LWC.  The district court permitted Cecil to supplement the record with the NORI, holding that it was admissible as an investigative report of a government agency under Rule 803(8)(C) of the Federal Rules of Evidence.  It then granted LWC's summary judgment motion in full.  Cecil timely appealed.

**II**

**A. Standard of Review and Summary Judgment Standard**

---

[7]Upon receipt of a right to sue letter from the EEOC, a claimant has 90 days in which to initiate civil proceedings.  42 U.S.C. § 2000e-5(f)(1).

We review a district court's grant of summary judgment *de novo*. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A "genuine" dispute is one that would permit a reasonable jury to return a verdict in favor of the nonmoving party. *Henderson v. Walled Lake Consol. Schs.*, 469 F.3d 479, 487 (6th Cir. 2006). A fact is "material" only if its resolution could affect the outcome of the litigation under the applicable law. *Id.* At the summary judgment stage, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007).

## B. Disparate Treatment

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Cecil alleges that the following discrete acts by LWC constituted discrimination because of her sex: 1) denying her training; 2) giving her unattainable and undesirable work assignments; 3) outsourcing her job responsibilities; 4) disciplining her; 5) giving her only a 1% salary raise in 2004; and 6) discharging her. Although LWC argues that some of these acts are barred by Title VII's 300-day statute of limitations, *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), we decline to address that question because even the arguably untimely acts fail on the merits.

A plaintiff may establish discrimination by either direct or circumstantial evidence. *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006). Direct evidence is "evidence that proves the existence of a fact without requiring any inferences." *Id.* It is evidence which, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Cecil argues that the evidence of Eiler's specific bias against females, the company's own finding of such a "perceived bias," and the results of the OFCCP investigation constitute direct evidence of discrimination. At best, however, the company's finding only acknowledges that Eiler "periodically" made inappropriate comments that left a "'perception' of unacceptable biases towards certain individuals," J.A. at 254; it does not concede that an objectively discriminatory environment actually existed for Cecil individually. And although the NORI may acknowledge a discriminatory environment at LWC generally, its findings do not specifically refer to Cecil and it defers any individual findings to the federal court. J.A. at 297. Because this evidence does not require us to conclude that Cecil was subjected to discrimination, it is not direct evidence.

In the absence of direct evidence, we analyze discrimination claims under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Vincent v. Brewer Co.*, 514 F.3d 489, 494 (6th Cir. 2007). Where, as here, a case is at the summary judgment stage, "the plaintiff must submit evidence from which a reasonable jury could conclude both that she has established a prima facie case of discrimination and that the defendant's legitimate, nondiscriminatory reason for its action, if any, is pretext for unlawful discrimination." *Id.*; *see also McDonnell Douglas*, 411 U.S. at 802-04. To establish a prima facie case, a plaintiff must show that

1) she is a member of a protected class;  2) she was subjected to an adverse employment decision;  3) she was qualified for the position;  and 4) she was replaced by a person outside the protected class, or treated differently than similarly situated non-protected employees.  *Vincent*, 514 F.3d at 494.

Even were we to assume, for the sake of argument, that Cecil has satisfied her burden of establishing a prima facie case with respect to each of the alleged incidents of discrimination, LWC has nonetheless offered legitimate, nondiscriminatory reasons for its actions.  The employer need only articulate a nondiscriminatory rationale, *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996), and the parties do not dispute that LWC has done so here.  As to the lack of training, Kimbel testified that "the workload was such that . . . there just wasn't the ability to provide a lot of " formal training.  Kimbel Dep. 24, J.A. at 563.  The February 2002 training was canceled because LWC was in the process of giving Cecil responsibility for transmission mains, and the training was unrelated to those duties.  Cecil even testified that she did not "have a problem with [that training] being pulled, it was the fact that I was not told."  Cecil Dep. 314-15, J.A. at 443.  Further, Eiler exercised his business judgment in assigning projects, while the outsourcing and reassignment of Cecil's duties was due to a departmental reorganization.  Cecil's disciplinary violations were based on her admitted failure to arrive and remain at her work station on time, and the reduced 1% salary increase was a result of those violations.  Finally, Cecil was discharged because she refused to sign the PQIC Statement requiring her to improve her attendance.

Cecil cannot demonstrate that LWC's legitimate reasons for its actions were in fact only a pretext for intentional discrimination.  To establish pretext, the plaintiff must show that the employer's proffered reasons 1) had no basis in fact, 2) did not actually motivate the challenged

conduct, or 3) were insufficient to motivate the challenged conduct. *Grace v. USCAR & Bartech Tech. Servs., LLC*, 521 F.3d 655, 677 (6th Cir. 2008); *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 589 (6th Cir. 2002). "[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason" for taking an adverse employment action, however, "the employee cannot establish that the reason is pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). "An employer has an honest belief in its rationale 'when it reasonably relied on the particularized facts that were before it at the time the decision was made.'" *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 599 (6th Cir. 2007) (quoting *Majewski*, 274 F.3d at 1117). The key inquiry is whether the employer made a "reasonably informed and considered decision," not whether the decisional process was optimal or "left no stone unturned." *Id.* at 598-99 (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).

Cecil first attempts to show pretext by challenging the factual basis and sufficiency of LWC's reasons for her discipline and discharge. She argues that she should not have been disciplined for her conduct at the June 2004 meeting in which she disagreed with her then-process owner, Patti Kaelin, over proposed language in an easement agreement. But she was not disciplined for this conduct; she was only warned. Cecil also argues that she was not a tardy problem under the company's flex policy, which she says allowed her to come in late on days when she had worked late the night before. However, she had already been given permission to work from 9:00 am to 6:00 pm under the flex policy, and she still was unable to be at work on time. Even if she had been permitted

to take more liberties under the policy in the past, she admitted that when Kaelin came in as process owner, everyone was expected to be on time. Cecil Dep. 329-35, J.A. at 446-48.

Cecil also argues that she was not technically late because LWC's policy defined tardiness as ten minutes beyond the assigned start time. But according to LWC's documentation, she was over ten minutes late on many occasions. *See* J.A. at 246 (indicating Cecil was over ten minutes late twice in February 2004, six days in May 2004, eleven days in June 2004, and five days in the first two weeks of July 2004); J.A. at 250 (indicating Cecil was over ten minutes late five days in September 2005 and twice in the first week of October 2005). The record also indicates that LWC informed Cecil on September 21, 2005—before she was cited for her second tardiness violation—that the ten-minute grace period was meant for occasional and unavoidable situations, not for everyday abuse. J.A. at 250. Yet she was late to work for two and a half straight weeks in the last two weeks of September 2005 and the first week of October 2005. J.A. at 250. Counsel's unsupported assertion at oral argument that LWC's system for keeping track of arrival times was somehow inaccurate is insufficient to call into question the company's honest belief that Cecil was chronically tardy. Based on all of the facts before LWC, the company had a reasonable basis and an honestly held belief that Cecil's excessive tardiness was grounds for discipline.

Cecil's discharge was also reasonable under LWC's Employee Code of Conduct and Performance Policy, which required an employee to sign a Post-Decisional Leave Statement and a PQIC Statement for a third Class I violation, and provided for termination of employment for repeated Class I violations. J.A. at 275. Ultimately, Cecil cannot show that LWC's proffered

nondiscriminatory reasons had no basis in fact, were insufficient, or were anything but the product of sound and honest business judgment.

Further, Cecil is unable to create an issue of fact as to whether LWC's actions were actually motivated by her gender. As the district court concluded, the few inappropriate comments by Eiler are too thin a basis on which to invalidate LWC's nondiscriminatory reasons or to base a finding of intentional discrimination. Because Cecil has presented insufficient evidence by which a reasonable jury could conclude that the alleged adverse actions were actually motivated by discriminatory animus as opposed to legitimate, nondiscriminatory reasons, we affirm the district court's grant of summary judgment in favor of LWC on Cecil's disparate treatment claim.

## C. Hostile Work Environment

Title VII also prohibits conduct which is "sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To establish a prima facie case of hostile work environment, a plaintiff must prove that: 1) she is a member of a protected class;  2) she was subjected to unwelcome harassment;  3) the harassment was based upon her protected status; 4) the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment;  and 5) there is a basis for employer liability. *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008).

Cecil submits the following incidents contributed to a hostile work environment:  1) Eiler's negative comments, including the comments that she dressed too nicely, wanted to play in the dirt,

and reminded him of Lisa Douglas; 2) Eiler's denial of training and discriminatory assignment of work;  3) Eiler's humiliation of Cecil in meetings and when she asked for help; 4) LWC's finding of Eiler's "perceived bias" against females and the OFCCP's finding of a hostile work environment; 5) intimidation by male LWC employees;  6) Wehrle's comment about Cecil being "easy"; 7) the general "good old boy" culture at LWC;  and 8) the stalking and harassing phone calls.  Although Cecil has established that she is a member of a protected class who was subjected to some harassment, the parties disagree over whether she has shown that the harassment was based on her sex and that it was sufficiently severe and pervasive.

LWC first argues that the alleged incidents of harassment had nothing to do with Cecil being a female, and instead were based on a personality conflict.  Title VII protects any unequal treatment that would not have occurred but for the employee's sex, even if the conduct is non-sexual.  *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999).  Here, a reasonable jury could find that at least some of the harassment would not have occurred had Cecil been a male.  The gender-specific nature of Eiler's comments on Cecil's dress, her similarities to Lisa Douglas, and Wehrle's comment about Cecil being "easy" create an issue of fact as to whether Cecil's gender was the motivating factor for such conduct.  *See id.* at 565-66.  However, we will not consider the alleged incidents of stalking and threatening phone calls, as Cecil only alleges they were in retaliation for her complaints of discrimination—not because of her sex.  *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790-91 (6th Cir. 2000) (refusing to include alleged retaliatory conduct in the hostile work environment calculus because plaintiff did not suggest the conduct was committed "because of sex").

Even if the harassment was based on Cecil's sex, it still must be severe and pervasive to be actionable. In evaluating the severity and pervasiveness of workplace harassment, we consider the totality of the circumstances. *See Williams*, 187 F.3d at 562; *see also Harris*, 510 U.S. at 23. Relevant circumstances include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Viewed as a whole, the environment must be both objectively and subjectively offensive, hostile, and abusive. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to" a hostile work environment. *Id.* at 788. Rather, "conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.* We have consistently rejected any invitation to convert Title VII into a "code of workplace civility." *Grace*, 521 F.3d at 679.

Viewing Cecil's allegations as a whole, we agree with the district court that the incidents were not so severe and pervasive that a reasonable person would find her work environment hostile and abusive. The comments, while admittedly inappropriate, appear to have been isolated incidents over the one-year period in which Eiler was Cecil's process owner. *See Morris*, 201 F.3d at 790 (holding that several dirty jokes, a verbal sexual advance, a one-time reference to plaintiff as "Hot Lips," and comments about plaintiff's state of dress were not sufficiently severe and pervasive). Moreover, Cecil has not presented evidence indicating that any of the alleged incidents of harassment interfered with her work performance. While Eiler's presence on her floor after he was reassigned

in 2002 may have been uncomfortable, Cecil testified that it did not impair her ability to do her job, and LWC transferred him to a different location after a month. Cecil's general, conclusory allegations of "open mockery and verbal abuse" and "hostility" that was "pervasive" are also insufficient to survive summary judgment. *See Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) (holding that plaintiff's conclusory assertions of continuous "racial harassment" were insufficient).

Cecil attempts to bolster her hostile work environment claim with the OFCCP's general findings of a hostile work environment and the company's own findings of Eiler's "perceived bias" against females. LWC contends that the OFCCP's findings are inadmissible under Rule 803(8)(C) because the sources of information and the circumstances of the investigation indicate a lack of trustworthiness. Yet, even assuming the NORI is admissible as a public record, *see Chandler v. Roudebush*, 425 U.S. 840, 863 n.39 (1976), it does not specifically address whether the environment was hostile—both subjectively and objectively—for Cecil individually. And it specifically "defer[s] any findings as to Ms. Cecil's individual claims to the results of the U.S. District Court's opinion." J.A. at 297. Further, the company's own finding of a "'perception' of unacceptable biases" by Eiler, creating "an adversarial environment especially among female employees," J.A. at 254, indicates that LWC may have acknowledged the subjective perceptions of some of its female employees, but it does not admit that an objectively hostile, severe, and pervasive atmosphere existed for Cecil individually. Even considering this evidence, Cecil has not satisfied her burden of showing a hostile work environment, and summary judgment for LWC was therefore proper.

**D. Retaliation**

Under Title VII, it is an unlawful employment practice "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Cecil claims fourteen incidents of retaliation: 1) the negative comments on the green bar sheets about Cecil and other female employees; 2) retaliation from project managers; 3) exclusion from meetings and a plant tour; 4) removal of tank site duties; 5) discipline; 6) negative evaluations; 7) 1% salary increase; 8) Eiler remaining on her floor after being reassigned; 9) Heitzman's "ripple effect" comment; 10) Huber's company-wide emails regarding Cecil's lawsuit; 11) stalking; 12) harassing and threatening phone calls; 13) relocation of Cecil's desk near Eiler's immediate supervisor; and 14) discharge.

In the absence of direct evidence, we review Cecil's retaliation claims under the *McDonnell Douglas* framework. *Weigel v. Baptist Hosp.*, 302 F.3d 367, 381 (6th Cir. 2002). To establish a prima facie case of retaliation, a plaintiff must show that: 1) she engaged in activity protected by Title VII; 2) the employer knew of her exercise of protected rights; 3) the employer took a materially adverse action against the plaintiff or subjected her to severe and pervasive retaliatory harassment; and 4) there was a causal connection between the protected activity and the adverse action. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003).

Many of the retaliatory acts Cecil alleges are insufficient to constitute materially adverse actions. A materially adverse action in the retaliation context is not limited to those actions that affect the terms and conditions of employment, or even acts that occur in the workplace; it is sufficient to show that the action would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006). A materially adverse action does not include trivial harms, such as "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

The comments on the green bar sheets,[8] Cecil's exclusion from a meeting and a plant tour, and the alleged uncooperativeness of Anthony Hewitt and the other project engineers strike us as such "petty slights or minor annoyances." So do Eiler's presence on Cecil's floor after his reassignment, the relocation of Cecil's desk, and Heitzman's "ripple effect" comment. Further, Huber's emails simply informed LWC employees of the lawsuit and emphasized the company's commitment to diversity. Cecil has not presented enough evidence to show that these incidents were so important as to dissuade a reasonable worker from making or supporting a charge of discrimination. Nor has she shown that, even viewing them as a whole, she was subjected to severe and pervasive retaliatory harassment.[9] *See Morris*, 201 F.3d at 793 (finding retaliatory harassment

---

[8]Aside from a hearsay statement by Patti Kaelin, Cecil Aff. ¶ 19, J.A. at 176, we note that Cecil has failed to provide any further evidence of the contents of the comments on these green bar sheets, let alone the originals, *see* Fed. R. Evid. 1002. Although she claims LWC destroyed the originals and required its employees to sign new green bar sheets, Cecil Aff. ¶ 19, J.A. at 176, she has failed to offer proof that the originals were actually destroyed.

[9]Cecil's allegations of threatening phone calls and stalking do not help her here, as she has not submitted enough evidence—aside from her own suspicions—for a reasonable jury to conclude

where plaintiff's supervisor visited her department over fifteen times, called her over thirty times, followed her home from work, and threw nails on her driveway). Finally, although "markedly lower performance-evaluation scores that significantly impact an employee's wages or professional advancement" may be materially adverse actions, *Halfacre v. Home Depot, U.S.A., Inc.*, 221 Fed. Appx. 424, 433 (6th Cir. 2007), Cecil has not shown that her negative evaluation significantly affected her salary or professional advancement.

Even assuming that the removal of Cecil's tank site duties, discipline, reduced salary increase, and discharge amounted to materially adverse actions, Cecil must produce evidence of a causal nexus between those actions and her protected activity. Temporal proximity is usually not enough to show causation. *Nguyen v. City of Cleveland*, 229 F.3d 559, 566-67 (6th Cir. 2000); *Cooper v. City of N. Olmstead*, 795 F.2d 1265, 1272 (6th Cir. 1986). "Where an adverse employment action occurs very close in time after an employer learns of a protected activity," however, temporal proximity may be enough. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). But "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* In *Mickey*, the plaintiff was found to have satisfied his burden of proving causation where his employer fired him the very day it learned of his EEOC charge. *Id.* at 526.

---

that Eiler or any other LWC employee was the source of these incidents.

First, regardless of temporal proximity, Cecil explicitly acknowledged that the removal of her tank site duties was not the result of her protected conduct. She testified that the duties were removed after she disagreed with Patti Kaelin in a June 2004 meeting. Cecil Dep. 349-50, J.A. at 451-52. She said the reassignment was "[a]s a result of the [disagreement about the proposed] language. I didn't – I didn't mean to imply the OFCCP. It just all happened right – just coincidentally right around the same time." Cecil Dep. 350, J.A. at 452.

Further, we are not convinced that the temporal proximity between several of the remaining actions and any of Cecil's protected conduct is sufficient to give rise to an inference of causation. LWC discharged Cecil in November 2005, approximately seventeen months after she complained to the OFCCP in June 2004. Cecil received her reduced 1% salary increase ten months after her OFCCP complaint. In contrast to the same-day firing of the employee in *Mickey*, these lengthy gaps are insufficient, on their own, to create a reasonable inference of causation. *See Giles v. Univ. of Toledo*, 286 Fed. Appx. 295, 305 (6th Cir. 2008) (holding seventeen-month period insufficient); *Evans v. Prospect Airport Servs.*, No. 07-5303, 2008 WL 2604312, at *7 (6th Cir. 2008) (holding period of "almost a year" insufficient). It is a closer call, however, whether the one-month gap between Cecil's June 2004 OFCCP complaint and her two July 2004 code of conduct violations is sufficient to show causation after *Mickey*. *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (holding three months sufficient); *Goller v. Ohio Dept. of Rehab. & Corr.*, 285 Fed. Appx. 250, 257 (6th Cir. 2008) (holding two-month gap sufficient after *Mickey*). *But see Arendale*, 519 F.3d at 606-07 (holding two-month gap insufficient). We need not make that call

today, however, because even if Cecil's is one of those few cases in which temporal proximity is enough, LWC has offered legitimate, non-retaliatory reasons for its actions and Cecil is unable to show that they are pretextual.

Assuming without deciding, then, that Cecil has satisfied her burden of establishing a prima facie case of retaliation, LWC has produced several legitimate business reasons for its actions. Cecil's work was outsourced and her tank site duties were ultimately removed due to a departmental reorganization and to increase productivity. The company disciplined her because she was chronically tardy, reduced her salary increase as a result of the discipline, and discharged her because she refused to sign the PQIC Statement.

And ultimately, as with her claims of disparate treatment, Cecil is unable to call into question the factual basis or sufficiency of LWC's proffered reasons, or LWC's honest belief that Cecil was chronically tardy and accordingly deserving of discipline, reduced salary, and discharge. The record is replete with evidence of Cecil's numerous tardiness violations and "the progressive disciplinary steps that had been undertaken in an effort to correct such behavior." *Russell v. Univ. of Toledo*, 537 F.3d 596, 609 (6th Cir. 2008). Cecil is also unable to present evidence that retaliation was the company's real motive. We conclude, therefore, that LWC was entitled to summary judgment on Cecil's retaliation claim.

**III**

Because Cecil has failed to establish a genuine issue of material fact on her claims of disparate treatment, hostile work environment, and retaliation, we **AFFIRM** the district court's grant of summary judgment in favor of LWC.